UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

    JMG Ventures, LLC,                       Case No. 3-24-11650-beh

          Debtor in possession.            Chapter 11

**DECISION AND ORDER ON VALUATION OF DEBTOR'S INVENTORY FOR PURPOSES OF CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION**

      Debtor JMG Ventures, LLC, filed a Chapter 11 bankruptcy petition on August 19, 2024, and elected to proceed under Subchapter V. JMG owns and operates a jewelry store in Middleton, Wisconsin, and seeks to reorganize and continue as an operating concern. To effect that goal, JMG filed a plan of reorganization that, among other things, pays the claims of several secured creditors in full (e.g., Classes 2–4), while paying only a portion of the claims of nonpriority unsecured creditors (including the claims of secured creditors that the plan treats as unsecured, allegedly because there is not enough equity in the value of JMG's assets for the claims to be fully or partially secured under 11 U.S.C. § 506(a)).

      Creditor Kapitus, LLC, falls into the latter group of secured ("unsecured") creditors. Kapitus (through its agent Kapitus Servicing, Inc.) filed a proof of claim for $174,701.26 and asserts that its claim is fully secured by virtue of a security interest in all the debtor's receivables, inventory, equipment, intangibles, investments, cash, and proceeds thereof. Kapitus objects to its treatment as an unsecured creditor in the debtor's plan, arguing that JMG has undervalued its jewelry inventory significantly, thereby resulting in the improper classification.[1] Because Kapitus's security interest is subordinate to the interests of five other secured creditors with claims together totaling

---

[1] The value of the debtor's other assets is not in dispute.

approximately $770,000, *see* ECF No. 198, at 4, the value of JMG's inventory—and whether that inventory is valued at retail price (as Kapitus urges) or wholesale cost (as JMG urges)—will determine whether Kapitus's claim should be treated as secured or unsecured vis-à-vis plan confirmation.[2]

To resolve this valuation dispute (and allow the parties to present evidence and argument on the "replacement value" of the debtor's jewelry inventory), the Court held two evidentiary hearings and ordered two subsequent rounds of briefing.

Based on the record, the Court makes the following findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

## FACTS

JMG owns and operates a jewelry store called "Middleton Jewelers" in Middleton, Wisconsin, which it describes as "Madison and Middleton's premier gold and jewelry destination." ECF No. 193, at 1. While the bulk of Middleton Jewelers' sales come from custom jewelry designs and repairs (approximately 70%), the store also sells inventory out of its display cases (accounting for 30% of sales), and upon special request will acquire gold bullion for clients.

Manmeet Soin is the sole owner and manager of JMG and one of its five employees. Relevant here, Mr. Soin testified about the business's purchasing practices, the composition of its inventory (including the difference between inventory the debtor owns and inventory it holds by virtue of memoranda

---

[2] At an earlier procedural juncture, the Court resolved one facet of Kapitus's objection: whether JMG's reliance on the liquidation/foreclosure value of its assets to calculate the amount of Kapitus's secured claim under 11 U.S.C. § 506(a)(1) for purposes of non-consensual confirmation under 11 U.S.C. §§ 1191(c)(1) & 1129(b)(2)(A) was appropriate as a matter of law. The Court concluded that it was not, *see* ECF No. 177, finding that, in the circumstances and consistent with *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), the proper valuation standard is "replacement value," rather than liquidation value. The Court left for another day (and for the presentation of evidence) the question of what replacement value means in the circumstances, i.e., "[w]hether replacement value is the equivalent of retail value, wholesale value, or some other value." ECF No. 177, at 4 (quoting *Rash*, 520 U.S. at 965 n.6 (quotation marks omitted)).

agreements, or "on memo"[3]), and the value of JMG's inventory on both a wholesale and retail basis.

Mr. Soin, as manager of JMG, works with a group of trusted vendors who visit the store regularly, to select jewelry for sale at Middleton Jewelers' retail location. Some of that jewelry JMG purchases outright, making installment payments to the vendors (usually over 30, 60, or 90 days), and internally categorizes this jewelry as "owned inventory."

JMG also displays for sale jewelry that it does not own—vendor-owned inventory that it holds "on memo," *see supra* note 3. Other than bearing the cost for safely maintaining, storing, displaying, and insuring this inventory, JMG has no financial commitment to the vendors unless and until the inventory is sold. Upon the sale of a piece of memo jewelry, JMG "trues up" with the vendor and remits the wholesale price, while keeping any additional profit above cost. Vendors may remove or replace items of memo inventory as they please. Mr. Soin explained that he enters these memo arrangements primarily for high-value items, enabling the store to offer a wider selection of inventory to clients. Although some memo items are never sold (and thus returned to the vendors), their display may prompt customers to request similar custom jewelry, thus leading to other sales for JMG.

At the time of the evidentiary hearings, the wholesale value of JMG's owned inventory (the price JMG paid to purchase the inventory from its vendors) was $229,026.50 (ECF No. 182-2, Exhibit 2106), while the wholesale value of the debtor's "memo" inventory was $253,627.28 (ECF No. 182-1, Exhibit 2105). Mr. Soin testified that these wholesale prices are typical of the industry.

---

[3] "Memo" inventory, according to Mr. Soin, is not owned by JMG, but by its vendors. The store displays (and sells) vendor-owned inventory in a consignment-like arrangement. Middleton Jewelers does not pay a deposit on this inventory, yet it accepts the responsibility to display and securely store the items. After briefing, both parties (now) agree that this memo inventory fits the definition of consignment inventory under Wisconsin law, and therefore should be considered as part of JMG's assets for purposes of valuing Kapitus's claim and its treatment under the plan.

As for the retail prices Middleton Jewelers charges its customers, the store typically uses a two-time markup from wholesale to cover overhead costs including employee labor to set up and take down the displayed jewelry each day, to safely store the inventory when the store is closed, and to market the inventory, as well as other employee activity including proper record-keeping, jewelry making, and jewelry repair. Mr. Soin explained that vendors may suggest a retail price at which to offer the jewelry for purchase, sometimes recommending a two-time markup, or two-and-a-half-time markup, but generally, the recommended/eventual markup ranges from 80% to 100% of the wholesale cost of the inventory.

After considering that the store eventually sells some jewelry inventory at a discount, and accounting for JMG's costs of doing business, Mr. Soin estimated that the store typically makes a 25% to 30% profit on inventory jewelry sales. Mr. Soin added that he (and other similarly situated jewelry retailers) would not buy jewelry for resale at retail prices, because that would leave no margin to cover overhead costs and profit for the business.

Mr. Soin has been involved in the wholesale and retail jewelry industry since 2012, and the Court finds his testimony credible. Kapitus offered no witnesses.

## THE PARTIES' ARGUMENTS

Kapitus and JMG disagree as to the value of the inventory held at the store, and specifically, whether inventory should be valued at a wholesale or retail price. As noted, the wholesale cost of both the owned and memo inventory, as of the hearing, totaled $482,653.78. JMG contends that this is the proper value of the inventory for purposes of confirmation, as it represents the cost JMG would incur to buy replacement inventory of the same kind and for the same purpose.

Kapitus, on the other hand, argues that the inventory should be valued at a much higher retail price. Relying on Mr. Soin's testimony about a range of markup prices, Kapitus asserts that the value of the inventory is between

$965,307.56 (at two-times cost) and $1,206,653.45 (at two-and-a-half-times cost). *See* ECF No. 198.

The amount of the secured claims against the debtor's assets (including Kapitus's claim) is $948,512.66, detailed as follows:

| **Secured Creditor** | **Claim Amount** | **Collateral** |
|---|---|---|
| Cadles of West Virginia, LLC | 73,533.88 | Blanket (POC #3) |
| Rakower Corporation | 5,634.90 | (limited to memo and invoiced items placed by Rakower with JMG) (POC #2) |
| Transportation Alliance Bank | 146,495.26 | Blanket (POC #13) |
| U.S. SBA | 506,177.36 | Blanket (POC #7) |
| Navitas | 40,000.00 | TRJPLUS LASER ENGRAVING SYSTEM (POC #9) |
| Kapitus | 174, 701.26 | Blanket (POC #12) |
| **TOTAL** | **948,512.66** | |

ECF No. 198, at 3–4.

Per Kapitus, if the replacement value of JMG's inventory is set at its retail value then the value of JMG's assets subject to Kapitus's security interest (based on the current record) is between $1,164,549.56 and $1,405,895.45,[4] meaning that Kapitus's claim is fully secured. On the other hand, if replacement value is determined to be JMG's cost of the inventory, or the wholesale price, then the total value of the debtor's assets subject to Kapitus's security interest is $681,895.78 (again, based on the current record), and Kapitus's claim is wholly unsecured for purposes of confirmation. Whether Kapitus has a secured or unsecured claim depends on the manner of valuation.

---

[4] JMG's other assets pledged as security for Kapitus's claim include Office FF&E, Machinery/ Equipment, Gold/ Silver Scrap, Cash/ Accounts, Deposits/ Prepayments, and Accounts Receivable. The total undisputed value of these assets, as of the hearings, was $199,242.00.

## DISCUSSION

The Court begins with the relevant statutory text. The value and extent of a secured claim are governed by 11 U.S.C. § 506(a):

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1). Put simply, section 506(a) permits a secured creditor's claim to be bifurcated into a secured portion (equal to the value of the collateral securing the claim) and an unsecured portion (the amount exceeding the collateral value) for various bankruptcy purposes. "Such value"—i.e., the value of the collateral securing the claim—"shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." *Id.*

Valuation of JMG's inventory for confirmation purposes is guided by the Supreme Court's holding in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997). In *Rash,* the Court addressed the proper application of § 506(a) in the context of a debtor exercising his "cramdown" option under 11 U.S.C. § 1325(a)(5)(B) to retain collateral over a secured creditor's objection, provided that the debtor pay the creditor "the present value of the collateral."[5] The debtor in *Rash* sought to retain a tractor truck that he used in his freight-hauling business and urged that the "present value" of the truck, for cramdown purposes, should be the net amount that the creditor would realize upon repossession and sale of the collateral—i.e., foreclosure value. 520 U.S. at 957–

---

[5] Although *Rash* was a Chapter 13 case, "[c]ourts have recognized that similar reasoning applies with equal force in the Chapter 11 reorganization context." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012). *See also In re Mayslake Village–Plainfield Campus, Inc.,* 441 B.R. 309, 320 n.2 (Bankr. N.D. Ill. 2010) ("The same [replacement] value can be used in this matter, even though a Chapter 11 cram down plan is involved."); *In re Creekside Senior Apartments, LP*, 477 B.R. 40, 55 (6th Cir. BAP 2012) ("Although *Rash* was decided in the context of Chapter 13, its holding applies equally to valuation of secured claims in Chapter 11."); *In re Murray Metallurgical Coal Holdings, LLC*, 618 B.R. 220, 236 (Bankr. S.D. Ohio 2020) (same, citing cases).

98. The creditor, on the other hand, argued that the value of the truck was the price the debtor would have to pay to purchase like property—i.e., "replacement value." *Id.*

Observing that a "debtor's 'use' of the property" is "[o]f prime significance," *id.* at 963, the *Rash* Court considered that the debtor had "two options for handling allowed secured claims" (absent creditor consent): surrender the collateral to the creditor, or retain and use the collateral for the debtor's benefit. *Id.* at 962. Because the debtor had "elected to use the collateral to generate an income stream" instead of surrendering the collateral to the creditor, "[t]hat actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use.'" *Id.* at 963.

The *Rash* Court therefore rejected the foreclosure value standard in favor of "replacement value"—i.e, "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Id.* at 959 n.2; *see also id.* at 965 ("In sum, under § 506(a), the value of property retained because the debtor has exercised the § 1325(a)(5)(B) 'cram down' option is the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use.'"). Critically, the *Rash* Court left "to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented," noting that "[w]hether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property." *Id.* at 965 n.6.

Here, the parties have presented two different methods to value the inventory: (1) wholesale value, or the original cost of the inventory, and (2) retail value, or the price the debtor charges customers to buy the inventory. Kapitus challenges the debtor's use of wholesale value, arguing that retail value is a more accurate representation of the inventory's worth. Kapitus first claims that the sale of inventory, as contemplated by the debtor's plan, falls within the common meaning of the word "disposition." *See Disposition*, Black's Law

Dictionary (11th ed. 2019) ("The act of transferring something to another's care or possession."). Accordingly, because the debtor's sale of inventory at retail is a "disposition" under § 506(a)(1), the inventory's retail value should be the most appropriate valuation method. *See* ECF No. 198, at 9. Kapitus cites no case law to explain why this distinction (disposition vs. use) compels a retail valuation.[6]

Kapitus next argues that this Court should look to the "going concern" value of the collateral, pointing to *In re Hawaiian Telcom Commc'ns, Inc.*, 430 B.R. 564, 602 (Bankr. D. Haw. 2009), *In re Nellson Nutraceutical, Inc.*, Case No. 06-10072(CSS), 2007 WL 201134 (Bankr. D. Del. Jan. 18, 2007), and *Matter of Savannah Gardens-Oaktree*, 146 B.R. 306 (Bankr. S.D. Ga. 1992). These cases are readily distinguishable and do not support Kapitus's argument.[7] Avoiding *Rash* altogether, Kapitus contends these cases show that the going concern value (which Kapitus does not define or attempt to quantify) is the more appropriate basis to value the debtor's inventory, and therefore replacement value should be decided from the perspective of the debtor as a business

---

[6] Like the present case, in *ESL Investments, Inc. v. Sears Holdings Corp. (In re Sears Holdings Corp.)*, the Second Circuit considered whether the sale of collateral constituted a "disposition" or "use" under § 506(a). *Sears Holdings Corp.*, 51 F.4th 53, 62 (2d Cir. 2022). The *Sears* court found that the sale of inventory falls within the ordinary meaning of "disposition," and that the debtors' sale was properly categorized as such. *Id.* at 62–63. Although the Second Circuit agreed that the sale of inventory meets the definition of a "disposition," the *Sears* Court did not require the use of either a wholesale or retail valuation of the debtors' inventory, based on the specific—and dissimilar—facts of the case (in which it was uncertain, at the time of filing and when the valuation decision was issued, whether the debtors' assets would be sold in a going-concern sale or forced liquidation).

[7] The debtor in *Hawaiian Telcom* was a telecommunications provider that proposed a plan based on the company's "total enterprise value"; the court had no occasion to consider the proper valuation of inventory purchased at wholesale by a retail merchant, but instead had to weigh the competing enterprise valuations offered by various experts. Similarly, the court in *Nellson* was tasked with determining the enterprise value of the debtors—and specifically, whether the debtors' equity holders were "out of the money," so to speak, based on that valuation—not the value of specific inventory or other discrete assets, or whether the court should rely on any valuation methodology other than enterprise/going concern. Finally, the *Savannah Gardens-Oaktree* case predates *Rash* and involved the valuation of an apartment complex in the context of adequate protection. *Cf. In re Mach., Inc.*, 287 B.R. 755, 762 (Bankr. E.D. Mo. 2002) (if an active market exists for the products in question, the court should look to that active market instead of relying on expert theories).

operator, as opposed to the perspective of the debtor as a purchaser of assets. *See* ECF No. 198, at 10 ("In the context of a retail operation, such as the Debtor's, the going concern value to the Debtor should take account [of] the revenues generated from its retail sales, which sales are the goal and objective of the continuing operation of the Debtor's jewelry business. A replacement value based upon the cost to replace inventory ignores the going concern value of the Debtor's assets.").

But Kapitus's "going concern" argument suffers another flaw. To establish going concern value a party must present expert testimony from a qualified valuation professional using accepted methodologies such as discounted cash flow analysis, comparable company analysis, or market-based approaches. *See, e.g., Hawaiian Telcom*, 430 B.R. at 577 (noting that "[a]ll three valuation experts employed the three commonly accepted valuation methodologies [to determine enterprise value], namely (a) the comparable company analysis, (b) the precedent transaction analysis, and (c) the discounted cash flow . . . analysis."); *Nellson,* 2007 WL 201134, at *1 ("The task before the Court is to determine the Debtors' enterprise value. Generally speaking, in order to accomplish that task the Court would consider the opinions of the competent experts. There would be few, if any, factual disputes to be resolved.").[8] Documentation including financial statements, cash flow projections, and industry data are required to support a going concern valuation. Here, Mr. Soin was the only witness to testify. While he authenticated Exhibits 2105 (list of memo inventory), 2106 (list of owned

---

[8] *See also In re Mach., Inc.*, 287 B.R. at 761–62 (striking affidavit submitted by creditor valuing aerial lifts securing its claim using a discounted cash flow method based on the nature of the collateral at issue; while the discounted cash flow method is proper in certain circumstances—e.g., "valuing the equity of a closely held corporation that has very few comparable publicly traded competitors to gauge the market value"—such a valuation was "not relevant under *Rash* and would not be admissible at a trial in determining the replacement cost of the [l]ifts," where the debtor had established that an active market for the lifts existed, and the debtor could replace its inventory of lifts by purchasing replacements at auction); *HSBC Bank USA v. UAL Corp. (In re UAL Corp.),* 351 B.R. 916, 919–20 (Bankr. N.D. Ill. 2006) (noting that *Rash* "dealt with fungible property" and that "[w]ith this sort of fungibility, valuing 'like property' is a relatively straightforward fact-finding endeavor" in contrast to non-fungible property, where there is not a readily accessible market price).

inventory), and 2107 (liquidation analysis outlining both the assets of the business and the business's debts), his testimony did not include a comparable study of the jewelry market or discuss other market-based approaches.[9] Without the additional comparative evidence, and in light of Mr. Soin's testimony establishing customary access to a wholesale replacement market, this Court lacks a basis to assess the going concern approach Kapitus advocates.[10]

In contrast, JMG asserts that replacement value, as instructed by *Rash*, should be determined from the perspective of the debtor as purchaser or from the perspective of a willing buyer in the debtor's trade or business. Mr. Soin credibly testified that neither he nor any similarly situated jewelry retailer would purchase inventory for resale at retail price. If a jewelry merchant paid retail prices for its inventory, the jeweler would be forced either to sell inventory at much higher than retail prices, thereby losing business, or to take a loss on each item sold. In light of this testimony, JMG contends that the wholesale price reflects the accurate replacement value of its storefront inventory. *Compare In re Nat'l Truck Funding LLC*, 588 B.R. 175, 181 (Bankr. S.D. Miss. 2018) (in valuing semi-trucks owned and leased—and eventually sold when aged—by Chapter 11 debtors who proposed to retain the collateral and continue operating their business, the "replacement value" for purposes of calculating the secured creditors' claims was wholesale value, because "the Debtors are not buying trucks at retail; the Debtors routinely buy at wholesale . . . [and] [a]s the Plan Proponent's expert recognized, the Debtors have to buy on the wholesale market, because buying retail would eat up their profit margin").

---

[9] Nor did Mr. Soin authenticate any other financial statements or cash flow projections; instead, a considerable amount of his cross-examination testimony was spent explaining the difference between memo inventory and owned inventory, as well as outlining the details of several large purchases.

[10] As the Seventh Circuit "repeatedly ha[s] made clear," "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *U.S. v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991).

Although *Rash* had no occasion to consider the proper method of valuing retail inventory that a debtor intends to retain and sell in the ordinary course, the Supreme Court's focus on value from the debtor's perspective (i.e., "what the debtor would have to pay for comparable property," 520 U.S. at 955) is instructive. Replacement value under *Rash* is "not based on what a dissimilar stranger might be willing to pay for the property," but rather on what "a willing buyer *in the debtor's . . . situation* would pay to obtain like property from a willing seller." *In re Hermann,* 224 B.R. 101, 103–04 (Bankr. D. Minn. 1998) (emphasis in original, internal quotation marks omitted). *See also In re UAL Corp.,* 351 B.R. at 921 ("[I]n employing replacement value, the [*Rash*] Court recognized that different debtors might be able to procure a 'like property' replacement in different markets, at different prices," meaning the court must look to the market available to that particular debtor: "An ordinary consumer . . . might not have access to the wholesale market for automobiles, but a debtor in the business of selling automobiles would."); *In re Gonzalez,* 295 B.R. 584, 591–92 (Bankr. N.D. Ill. 2003) (rejecting wholesale valuation of property in Chapter 13 case where evidence showed debtor would have bought at retail).[11, 12]

---

[11] In 2005, the Bankruptcy Code was amended to add § 506(a)(2), which courts have characterized as a codification of *Rash* in individual Chapter 7 and 13 cases, and provides in part that the value of personal property held for personal, family or household uses is to be determined using "replacement value," defined as "the price a retail merchant would charge for property of that kind considering the age and condition of the property" without deduction for costs of sale or marketing. 11 U.S.C. § 506(a)(2). But in the context of this Chapter 11 case (as well as other non-consumer cases), "replacement value continues to be determined from the perspective of the debtor under the first sentence of § 506(a), as the Supreme Court directed in *Rash* in 1997." *In re Henry*, 457 B.R. 402, 407 (Bankr. E.D. Pa. 2011).

[12] These cases provide more support for JMG's argument than the case JMG itself cites, *In re Pelham Enters., Inc.,* 376 B.R. 684, 693 (Bankr. N.D. Ill. 2007), which JMG describes as finding "that valuation of the property at issue as shown on the debtor's tax returns constituted an admission of the fair market value of the property." ECF No. 197, at 8. *Pelham*, which was decided in the context of a motion for relief from stay, is inapposite here. The bankruptcy court in that case analogized a secured creditor's recent valuation of its restaurant property collateral at fair market value for "accounting and tax purposes" with a taxpayer's valuation in tax returns as an admission against interest, concluding that the creditor's prior concession was more probative of the property's value in relation to its current proposed use than the liquidation value the creditor advocated the court to accept. *See id.*

Kapitus continues: "In the circumstances of a reorganization plan based upon the debtor's continued business operations involving the retail sales of goods, Kapitus has not found any case that supports a replacement value of such collateral based solely upon the cost to the debtor, as a purchaser, to replace the inventory." ECF No. 198, at 10.

The Court, however, has located just such a case: *In re Nuts & Boltzs, LLC*, No. C/A 09-09615-DD, 2010 WL 5128961 (Bankr. D.S.C. July 2, 2010). While not precedential, *Nuts & Boltzs* provides useful guidance. In that case, the debtor, a retail merchant of hardware supplies, regularly replaced its inventory by purchasing through a wholesale market. 2010 WL 5128961, at *4. The bankruptcy court, following the Supreme Court's *Rash* decision—particularly its instruction that valuation should be determined from the debtor's perspective in situations where the debtor retains use of the collateral for its trade or business—used wholesale cost for inventory valuation, reasoning that replacement value for a retailer's inventory is the wholesale price. *See id.* at *3 ("In the context of a chapter 11 retail merchant with inventory under lien, the replacement cost is generally the wholesale cost. The testimony of Debtor's principal was to the effect that it regularly replaces its inventory by making wholesale purchases of inventory. Replacement cost for a consumer in a chapter 7 or 13 is the price the debtor would pay for replacement, i.e. paying retail to a seller of goods. The replacement cost of the goods for the merchant is the price the merchant would pay for replacement, i.e. wholesale paid to a distributor.").

The court in *Nuts & Boltzs* also dispensed with another argument that Kapitus now makes—that because Kapitus has a security interest in the proceeds of JMG's inventory, retail value is a more appropriate benchmark than wholesale value. *See* ECF No. 198, at 11 ("In addition, Kapitus has a security interest in the Debtor's inventory as well as in the proceeds from the Debtor's retail sales of its inventory."); 2010 WL 5128961, at *3 (the court's conclusion that replacement value equates to wholesale value "does not leave [the secured creditor] without an interest in the proceeds from the inventory as

it is sold," based on both the South Carolina U.C.C. and the Court's prior cash collateral orders). The same is true here.

As a final argument, Kapitus says that retail value is appropriate because "it captures the volatility of the cash flow projections included by the Debtor with the different iterations of its plan of reorganization." ECF No. 198, at 11. To illustrate, Kapitus compares JMG's projected *combined* expenditures for inventory ($15,000), natural diamond orders ($12,000), and lab grown diamond orders ($6,000), for a total of $33,000 for July 2025 (*see* ECF No. 156, Second Amended Plan, Ex. II), with what Kapitus asserts were JMG's *actual* inventory expenses in July 2025 of $89,000. ECF No. 198, at 11–12 (citing JMG's July 2025 Monthly Operating Report, ECF No. 184, at 7–11). From this, Kapitus concludes:

> It is evident from the discrepancies between the Debtor's cash flow projections and the Debtor'[s] actual use of cash that the Debtor has decided to plow its money from the proceeds it receives from its retail sales of its inventory into the purchase of replacement inventory. That decision by the Debtor has virtually eliminated the accumulation of significant amounts of cash, as projected by the Debtor, to pay creditor claims and replaces that cash with inventory.

ECF No. 198, at 12.

As best the Court can tell, Kapitus has misread the debtor's July operating report (and compounded the problem by misunderstanding Mr. Soin's testimony). To start, it is a mystery how Kapitus arrived at a figure of $89,000 in inventory purchases for July 2025. JMG's July 2025 operating report expressly designates several purchases as "inventory," and these entries total less than $68,000. *See* ECF No. 184, at 7–11. In addition, around $20,000 of that amount is attributable to purchases for diamonds (or from diamond vendors), which Mr. Soin testified are never included as part of JMG's jewelry inventory for retail sale, because JMG purchases individual diamonds only when needed upon customer request, for incorporation into custom jewelry pieces (and then promptly delivers the final product to the requesting

customer).[13] There is no other evidence or testimony of record to establish that the remaining $48,000 is, in fact, related to the purchase of retail inventory of the kind included in Exhibits 2105 or 2106 as Kapitus appears to suggest.[14] Kapitus's argument on this point is wholly speculative and unsupported by admissible evidence.

## CONCLUSION AND ORDER

In sum, *Rash* leaves the decision to the bankruptcy court to determine the appropriate valuation approach based on the particular facts of the case, considering the type of debtor and the type of collateral at issue. The facts of this case are unique (at least in the universe of reported decisions). To the extent some courts have considered, but rejected, use of wholesale cost as equivalent to "replacement value" under *Rash*,[15] none were faced with a retail merchant debtor whose principal had testified to having access to, and routine ordinary-course purchases in, a wholesale market. In contrast, the court in *Nuts & Boltzs* confronted facts similar to those here and, adhering to *Rash*, concluded that replacement value was equivalent to wholesale value because the retail merchant debtor had demonstrated access to a wholesale market for replacement inventory.

Following *Rash*, and analogizing to *Nuts & Boltzs*, this Court concludes that JMG's retail inventory collateral should be valued at wholesale cost for purposes of establishing the amount of Kapitus's secured claim under JMG's plan of reorganization.

---

[13] As noted, custom design and repair work accounts for 70% of JMG's sales, while retail inventory sales—i.e., sales of "as-is" inventory on display in its storefront and available to the general public—make up the remaining 30%.

[14] For example, it is very likely that some of the items Kapitus considers as inventory are what JMG categorizes as "supplies to do repairs" (e.g. jewelry clasps, gems, mountings, etc.), which its July 2025 projections estimated would be $15,000.

[15] *Compare In re UAL Corp.*, 351 B.R. at 921 (replacement value should depend on the nature of the property and the markets available to the particular debtor; because the property at issue was not fungible, a generic wholesale valuation was inappropriate); *In re Gonzalez*, 295 B.R. at 592 (wholesale value was inappropriate where debtor had not shown access to a wholesale market).

The Court understands that JMG intends to file an amended plan consistent with this decision (which also should account for any increase in the value of the debtor's inventory or other assets since the evidentiary hearings).

Therefore, for the foregoing reasons, it is ORDERED that Kapitus's objection to confirmation is overruled to the extent outlined in this decision, and that JMG shall file an amended plan consistent with this decision **no later than 28 days after entry of this order**.

Dated: March 6, 2026

By the Court:

Beth E. Hanan
United States Bankruptcy Judge